Hand-Delivered

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

FILED
CHARLOTTE, NC

AUG 11 2025

US DISTRICT COURT
WESTERN DISTRICT OF NC

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* [SEALED],<br><br>Plaintiff,<br><br>– Against –<br><br>[SEALED],<br><br>Defendant. | Case No.: 3:25-cv-606-MOC<br><br>**FALSE CLAIMS ACT COMPLAINT**<br><br>and<br><br>**JURY DEMAND**<br><br>**[TO BE FILED UNDER SEAL]** |

**FILED IN CAMERA AND UNDER SEAL UNDER**
**31 U.S.C. § 3730(b)(2)**
**DO NOT POST ON ECF**
**DO NOT PUT IN PRESS BOX**


Charles H. Rabon, Jr.
N.C. State Bar No. 16800
Rabon Law Firm, PLLC
413 S. Sharon Amity Road
Suite C
Charlotte, NC 28211

Stephen A. Teller, WSBA #23372
Teller Law
300 Lenora St. #1471
Seattle, WA 98121
(206) 324-8969
*To be admitted Pro Hac Vice*

*Attorneys for Plaintiff Relator*

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* DANIEL FOSTER,<br><br>Plaintiff,<br><br>v.<br><br>SUNSTAR AMERICAS INC., a Delaware corporation, and affiliated companies,<br><br>Defendant. | Case No.:<br><br>**FALSE CLAIMS ACT COMPLAINT**<br>and<br>**JURY DEMAND**<br><br>**[FILED UNDER SEAL]** |

## FALSE CLAIMS ACT COMPLAINT

Daniel Foster ("Relator") brings this action as a *qui tam* relator on behalf of the United States against Defendant Sunstar Americas Inc., pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3729-33, to recover damages, penalties, attorney fees and costs, and other relief.

## Introduction

1. In April 2020, Sunstar Americas, Inc., a U.S. subsidiary of the Switzerland-based Sunstar Suisse S.A (Sunstar Group), received a first-draw Paycheck Protection Program (PPP) loan of $6,230,492 through Bank of America. Based on a corporate disclosure statement, financial documents, and Department of Labor filings, Sunstar Americas and its affiliates, including Sunstar Engineering Americas, had over 570 employees in the United States and approximately 4,000 worldwide, rendering it ineligible for the loan. Including loan forgiveness of $6,302,185 and a lender processing fee of $62,304.92 paid by the SBA to Bank of America, the total loss to the Small Business Administration (SBA) is approximately $6,364,490.

2. Sunstar Americas was ineligible for its first-draw PPP loan of $6,230,492 because it failed to honestly account for the employees of its U.S. and foreign affiliates. Specifically, Sunstar Americas falsely certified that, including affiliates, it had "no more than the greater of 500 or employees or, if applicable, the size standard in number of employees established by the SBA in 13 C.F.R. 121.201 for the Applicant's industry," and that it was eligible for a PPP loan under the rules in effect at the time.

3. First, Defendant, together with its U.S. affiliate Sunstar Engineering Americas, had more than 500 employees in the United States alone. At the time of its loan application, both entities had at least 570 workers in the United States combined. Second, including all of its affiliates, Defendant had more than 4,000 employees worldwide, surpassing the 750-employee SBA size standard for its industry, Dental Equipment and Supplies Manufacturing (NAICS 339114), under 13 C.F.R. 121.201.

4. Defendant further failed to qualify under the SBA's alternative size standard limits of $5 million average net income after taxes and $15 million for tangible net worth. During its 2019 and 2020 fiscal years, Sunstar Group had global net sales exceeding $1.45 billion and average net income of approximately $88.5 million. Its affiliate, Sunstar Singapore PTE Ltd., reported a net worth exceeding $300 million.[1]

5. The actions of Sunstar Americas resulted in a loss to the United States government and American taxpayers, while also depriving genuine small businesses of limited PPP funds during a national emergency. By falsely claiming eligibility, Defendant gave itself an unfair advantage over American competitors that honestly determined their PPP eligibility and acted in good faith.

[1] Sunstar Engineering Americas also improperly received but later rescinded a PPP loan of $2,102,330.

6. No allegation in this complaint is based solely on a public disclosure of allegations or transactions in a federal criminal, civil, or administrative hearing in which the Government or its agent is a party; in a congressional, administrative, or General Accountability Office, or other Government report, hearing, audit, or investigation; or from the "news media." Rather, Relator is an original source. To the extent there has been such prior disclosure, Relator caused that disclosure to be made by his report to the government, and remains an original source.

7. This action is filed *in camera* and under seal pursuant to the requirements of the False Claims Act, 31 U.S.C. § 3730(b)(2).

**Jurisdiction and Venue**

8. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. § 3732, which confers jurisdiction over actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

9. This Court may exercise personal jurisdiction over Defendant, and venue is appropriate in this Court, under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b)(2), because the Defendant transacted business in this judicial District by submitting its PPP loan application and forgiveness application, in which it falsely certified its eligibility for a PPP loan, to Bank of America, which is located in this District. Defendant also distributes and sells nationally the products it manufactures, including within this judicial District.

10. Bank of America has a headquarters at 100 North Tryon Street, Charlotte, NC 28255.

## The Parties

11. Defendant Sunstar Americas, Inc. is a corporation organized under the laws of Delaware with its principal place of business at 301 E. Central Road, Schaumburg, Illinois 60195.

12. Sunstar Americas, Inc. is a subsidiary owned and managed by Sunstar Suisse S.A., a Swiss company that serves as the ultimate parent of the Sunstar Group, a global conglomerate based in Etoy, Switzerland.

13. The Sunstar Group, including Sunstar Americas and its affiliates, employed approximately 4,000 people worldwide in 2019, with over 570 employees in the United States, as reported in Department of Labor Form 5500 filings.

14. Relator Daniel Foster is a dual citizen of the United States and Germany, with a primary residence in Berlin, Germany. Relator holds certificates in forensic accounting and fraud examination and digital forensics. He first became aware of PPP fraud when he discovered that an organization with which he was affiliated had obtained PPP funds improperly, prompting him to use his investigative skills to identify other instances of apparent PPP fraud, including the fraud alleged herein.

## Additional Background on Defendant and its Affiliates

### A. Sunstar Americas Inc.

15. Sunstar Americas, Inc. is a subsidiary of Sunstar Suisse S.A., a Swiss company that serves as the ultimate parent of the Sunstar Group, a global conglomerate headquartered in Etoy, Switzerland. Sunstar Americas specializes in the manufacture and distribution of oral care products, including the GUM line of dental products.

16. Sunstar Americas, Inc. has its principal place of business at 301 E. Central Road, Schaumburg, Illinois 60195, and reported 435 employees on its PPP loan application in April 2020. Evidence suggests it may have employed additional workers through staffing agencies.

17. Sunstar Suisse S.A. is located at Route de Pallatex 15, Etoy, Switzerland 1163. It is the parent of Sunstar Americas, Inc. and its affiliates, as detailed in a corporate disclosure filed with the United States District Court for the Western District of Michigan in 2017 and as described on the Sunstar Group website.

18. Sunstar Americas, Inc. is affiliated with Sunstar Engineering Americas, a manufacturer of chemical adhesives located in Springboro, Ohio, which is a wholly owned subsidiary of Sunstar Singapore PTE Ltd., itself controlled by Sunstar Suisse S.A.

19. The Sunstar Group, including Sunstar Americas, Inc. and its affiliates, employed approximately 4,000 people worldwide in 2019 across its global operations. According to Department of Labor Form 5500 filings, Sunstar Americas had 428 active 401(k) participants at the end of 2019. Its affiliate Sunstar Engineering America, reported 142 active 401(k) participants. Together, both Sunstar US entities had approximately 570 employees during the relevant time period.

20. The Sunstar Group's financial statements indicate global net sales of approximately $1.64 billion USD in 2019 and $1.45 billion USD in 2020, with operating income of approximately $124.3 million USD in 2019 and $52.7 million USD in 2020. Sunstar Singapore PTE Ltd., a subsidiary, reported equity of approximately $326 million USD in 2019 and $349 million USD in 2020, far exceeding the SBA's alternative size standard limits for PPP eligibility.

## Legal Background

### A. The False Claims Act

21. The False Claims Act provides, in pertinent part, that any person who:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . .
>
> * * *
>
> is liable to the United States Government for a civil penalty of not less than $13,508 and not more than $27,018, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410 [1]), plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1).

22. For purposes of the False Claims Act, "the terms 'knowing' and 'knowingly' mean that a person, with respect to information[,] (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). No proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1)(B).

23. Because the False Claims Act is a civil remedy, the United States is required to prove all essential elements of the cause of action, including damages, by only a preponderance of the evidence. 31 U.S.C. § 3731(d).

### B. The Paycheck Protection Program

24. In March 2020, through the CARES Act, Pub. Law 116–136, Congress established the PPP to provide economic relief for small businesses during the coronavirus pandemic.

25. Under the first round of the PPP, an eligible business could apply for a loan of up to 2.5 times its average monthly payroll during 2019, subject to a maximum amount of $10 million. *See* 15 U.S.C. § 636(a)(36)(E); *see also* Small Business Administration ("SBA") Form 2483, Instructions.

26. An applicant for a first draw PPP loan could qualify as an eligible business under any of three standards:

> (1) having an average of no more than 500 employees during 2019 or during the 12 months prior to applying for a first draw PPP loan, *see* 15 U.S.C. § 636(a)(36)(D)(i)(I) *and* SBA, *PPP Loans Frequently Asked Questions*, Question 14 (April 6, 2020);
> (2) the SBA employee-based or revenue-based size standard corresponding to the business's primary industry, *see* 15 U.S.C. § 636(a)(36)(D)(i)(II) *and* SBA, *PPP Loans Frequently Asked Questions*, Question 2; or
>
> (3) the SBA's alternative size standard, which provided that the business must have (a) a maximum tangible net worth of not more than $15 million, *and* (b) average net income after tax of not more than $5 million for the business's two full preceding fiscal years as of March 27, 2020, *see* 86 Fed. Reg. 15083, 15085 n.5 (Mar. 22, 2021) *and* SBA, *PPP Loans Frequently Asked Questions*, Question 2.

27. Under each of these eligibility standards, the law required the business to include its affiliates in assessing whether the business met the standard. *See* 15 U.S.C. § 636(a)(36)(D)(iv). The affiliation rule in effect at the time, 13 C.F.R. § 121.301(f) (2019) (*available at* 81 Fed. Reg. 41423, 41428 (June 27, 2016)), provided that "[c]oncerns and entities are affiliates of each other when one controls or has the power to control the other, or a third party or parties controls or has the power to control both." The rule further elaborated that affiliation could arise under various circumstances, including:

> <u>Affiliation based on ownership</u>. For determining affiliation based on equity ownership, a concern is an affiliate of an individual, concern, or entity that owns or has the power to control more than 50 percent of the concern's voting equity. If no individual, concern, or entity is found to control, SBA will deem the Board of Directors or President or Chief Executive Officer (CEO) (or other officers, managing members, or partners who control the management of the concern) to be in control of the concern. SBA will deem a minority shareholder to be in

> control, if that individual or entity has the ability, under the concern's charter, by-laws, or shareholder's agreement, to prevent a quorum or otherwise block action by the board of directors or shareholders.
>
> Affiliation based on management. Affiliation arises where the CEO or President of the applicant concern (or other officers, managing members, or partners who control the management of the concern) also controls the management of one or more other concerns. Affiliation also arises where a single individual, concern, or entity that controls the Board of Directors or management of one concern also controls the Board of Directors or management of one o[r] more other concerns. Affiliation also arises where a single individual, concern or entity controls the management of the applicant concern through a management agreement.

*Id.*; *see also* SBA, *Affiliation Rules Applicable to U.S. Small Business Administration Paycheck Protection Program* (April 3, 2020).

28. To apply for a first draw PPP loan, a business would submit an SBA Form 2483 to an authorized lender or complete an online application mirroring this form. On information and belief, Bank of America utilized an online application portal.

29. Bank of America advised applicants that the eligibility requirements for the program were outlined on the U.S. Treasury and SBA websites. It provided multiple links to these resources on its PPP webpage.

30. The PPP application process itself required a potential borrower to list its number of employees, including those of affiliates. Potential borrowers were also required to disclose "all owners of 20% or more of the equity of the Applicant," and whether the "the Applicant or any owner of the Applicant [is] an owner of any other business, or have common management with, any other business."

31. The PPP application also required an applicant to certify that it had "no more than the greater of 500 employees, or if applicable, the size standard in number of employees established by the SBA in 13 C.F.R. 121.201 for the Applicant's industry." Under 13 C.F.R. § 121.201, applicants were instructed to include "[the] concern and its affiliates" to determine

> **§ 121.201 What size standards has SBA identified by North American Industry Classification System codes?**
>
> The size standards described in this section apply to all SBA programs unless otherwise specified in this part. The size standards themselves are expressed either in number of employees or annual receipts in millions of dollars, unless otherwise specified. The number of employees or annual receipts indicates the maximum allowed for a concern and its affiliates to be considered small.

eligibility with greater than 500 employees under the industry size standard.

32. On a supplementary webpage explaining common terms relevant to the industry size standards, as of and prior to April 1, 2020, the SBA communicated the following definition of "affiliates:"

> **Affiliates**: You must include the employees or receipts of all affiliates when determining the size of a business. Affiliation with another business is based on the power to control, whether exercised or not. The power to control exists when an external party has 50 percent or more ownership. It may also exist with considerably less than 50 percent ownership by contractual arrangement or when one or more parties own a large share compared to other parties. Check the SBA's compliance guide for size and affiliation for more detailed information.

33. The SBA further communicated that the affiliation rules must be applied under the industry and alternative size standards through other published guidance. See PPP Loans Frequently Asked Questions, Question 5 (April 6, 2020):

> 5. Question: Are borrowers required to apply SBA's affiliation rules under 13 C.F.R. 121.301(f)?
>
> Answer: Yes. Borrowers must apply the affiliation rules set forth in SBA's Interim Final Rule on Affiliation. A borrower must certify on the Borrower Application Form that the borrower is eligible to receive a PPP loan, and that certification means that the borrower is a small business concern as defined in section 3 of the Small Business Act (15 U.S.C.

> 632), meets the applicable SBA employee-based or revenue-based size standard, or meets the tests in SBA's alternative size standard, after applying the affiliation rules, if applicable. SBA's existing affiliation exclusions apply to the PPP, including, for example the exclusions under 13 CFR 121.103(b)(2).

34. The SBA also advised that part-time workers and employees obtained through a leasing concern must also be included in determining headcount. This would include individuals employed through a third party staffing company. 13 C.F.R. 121.106 (a) sets out how the SBA calculates the number of employees, in pertinent part, as follows:

> (a) In determining a concern's number of employees, SBA counts all individuals employed on a full-time, part-time, or other basis. This includes employees obtained from a temporary employee agency, professional employer organization or leasing concern.

35. Notably, when the PPP first came into effect, SBA issued guidance that "[y]ou are eligible for a PPP loan if you have 500 or fewer employees whose principal place of residence is *in the United States*." 85 Fed. Reg. 20811, 20812 (April 15, 2020) (emphasis added). On May 5, 2020, however, SBA clarified that a PPP "applicant must count all of its employees and the employees of its U.S. *and foreign affiliates*." 85 Fed. Reg. 30835, 30836 (May 21, 2020).

36. PPP applicants were always advised to include foreign and domestic affiliates in determining their eligibility, including domestic affiliates as they applied to the 500-employee standard. As an exercise of enforcement discretion, the SBA declared that it would not find any borrower that applied for a PPP loan prior to May 5, 2020 to be ineligible based on the borrower's exclusion of non-U.S employees from the borrower's calculation of its employee headcount if the borrower *(together with its affiliates)* had no more than 500 employees whose *principal place of residence is in the United States*. (emphasis added) 85 Fed. Reg. 30835, 30836 (May 21, 2020).

37. This waiver did not apply to applicants who, including any affiliates, had greater than 500 employees in the United States, including affiliates. These applicants could only qualify for the PPP under the size standard for their industry listed in 13 C.F.R. § 121.201 or the separate alternative size standard. Here, the relevant regulations made clear that any affiliates must be included with no geographic limitations.

38. In summary, a US subsidiary of a foreign corporation, through the SBA safe harbor, could generally receive a first-draw loan prior to May 5, 2020, so long as its total affiliated US headcount remained under 500 employees. If the US subsidiary had other American affiliates and their combined U.S. headcount exceeded 500 employees, the subsidiary would not qualify for PPP funding under the SBA's 500-employee size standard. In that case, it could only seek eligibility under either the applicable industry-based size standard or the alternative size standard—both of which require the inclusion of foreign affiliates and do not fall within the SBA's safe harbor.

39. The statutes creating the PPP program provided that SBA would reimburse PPP lenders for processing at specified rates. As relevant here, the rate for first draw loans of $2 million or more was 1 percent. *See* 15 U.S.C. § 636(a)(36)(P)(i)(I)(cc).

40. The PPP also provided for full forgiveness of a loan so long as the borrower used the loan proceeds in accordance with the PPP rules and did not reduce the number of its employees. *See* 15 U.S.C. § 636m; SBA, *Frequently Asked Questions (FAQs) on PPP Loan Forgiveness* (Oct. 13, 2020). To the extent a borrower reduced the average number of its employees in the months after receiving the loan, the PPP created a formula for reducing the loan forgiveness amount accordingly. *See* 15 U.S.C. § 636m(d)(2).

## The Sunstar Group PPP Loans

### A. The Sunstar Americas, Inc. First Draw Loan

41. On April 30, 2020, Sunstar Americas, Inc. was approved for a first-draw Paycheck Protection Program (PPP) loan of $6,230,492.00 through Bank of America, National Association (loan number 5435547310).

42. Sunstar Americas, Inc. listed 435 jobs on its application. This was a misrepresentation because, including the employees of its U.S. affiliate, Sunstar Engineering Americas, and its foreign affiliates under the Sunstar Group, it had at least 570 workers in the United States and approximately 4,000 worldwide.

43. Sunstar Americas, Inc. listed an address of 301 E. Central Road, Schaumburg, Illinois 60195 on its application.

44. Sunstar Americas, Inc. classified itself under NAICS code 339114 (Dental Equipment and Supplies Manufacturing). This industry has a size standard of 750 employees, including affiliates, for first-draw loans.

45. On June 25, 2021, Sunstar Americas, Inc. applied for loan forgiveness. The SBA granted forgiveness of $6,302,185.00, including interest, on July 17, 2021.

46. The SBA also paid Bank of America, National Association a lender processing fee of $62,304.92 in connection with the loan.

### B. The Sunstar Engineering Americas Rescinded PPP Loan

47. On or before May 5, 2020, Sunstar Engineering Americas was approved for a first-draw PPP loan of $2,102,330.00 through an unspecified lender (loan number 2130977403).

48. This loan was rescinded on or around May 7, 2020.

## Defendant Did Not Satisfy Any of Three Eligibility Standards for First Draw Loans

### A. Defendant and its US Affiliate Employed More Than 500 People

49. Sunstar Americas reported 435 employees on its PPP application. At the end of 2019, Sunstar Americas had 428 active participants in its 401(k) plan. Combined with the 142 active 401(k) participants reported by its US affiliate Sunstar Engineering Americas, it had at least 570 workers in the United States. Including part-time workers and employees obtained through staffing agencies, its total headcount may have been even higher. Sunstar Americas was ineligible for the PPP under the 500-employee size standard. It not entitled to the SBA's enforcement variance for foreign affiliations because, combined with Sunstar Engineering Americas, it had more than 500 employees in the United States.

### B. Defendant Did Not Satisfy The SBA's Small Business Size Standard Corresponding To Its Primary Industry

50. During the relevant time period, the SBA Table of Small Business Size Standards provided that an entity engaged in "Dental Equipment and Supplies Manufacturing" (NAICS Code 339114) could qualify as a small business if it and its affiliates had no more than 750 employees. The SBA placed no geographic or other restrictions on the meaning of affiliates. It advised that any company under common ownership or management was an affiliate in this context.

51. Sunstar Americas was ineligible on this basis because, including affiliates, it had approximately 4,000 employees.

### C. Defendant Did Not Satisfy The SBA's Alternative Size Standard

52. The Sunstar Group's financial statements indicate global net sales of approximately $1.64 billion USD in 2019 and $1.45 billion USD in 2020, with operating income

of approximately $124.3 million USD in 2019 and $52.7 million USD in 2020. Sunstar Singapore PTE Ltd., a subsidiary, reported equity of approximately $326 million USD in 2019 and $349 million USD in 2020.

53. These figures far exceed the $5 million net income limit and $15 million tangible net worth limit under the alternative size standard. Sunstar Americas did not qualify for the PPP on this basis.

**Fraud Allegations**

54. Defendant Sunstar Americas did not qualify for the PPP loan program. As alleged above, Defendant, together with its affiliates, including Sunstar Engineering Americas and the broader Sunstar Group, had over 570 employees in the United States and approximately 4,000 employees worldwide during the relevant period. Defendant and its affiliates did not have an average of fewer than 500 employees during the relevant periods for the first-draw loan, nor did they meet the applicable industry size standard of 750 employees for NAICS code 339114 (Dental Equipment and Supplies Manufacturing) or the alternative size standard, as the Sunstar Group's operating income was approximately $124.3 million USD in 2019, and its subsidiary, Sunstar Singapore PTE Ltd., reported equity of approximately $326 million USD in 2019.

55. In its application for a PPP loan, Defendant falsely certified the following:

- The Applicant is eligible to receive a loan under the rules in effect at the time this application is submitted that have been issued by the Small Business Administration (SBA) implementing the Paycheck Protection Program under Division A, Title I of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) (the Paycheck Protection Program Rule).

- The Applicant (1) is an independent contractor, eligible self-employed individual, or sole proprietor or (2) employs no more than the greater of 500 or employees or, if applicable, the size standard in number of employees established by the SBA in 13 C.F.R. 121.201 for the Applicant's industry.

56. These certifications, made to Bank of America and the SBA, were materially false, and knowingly made, as that term is defined by the False Claims Act. Later, when Defendant applied for loan forgiveness through Bank of America, it falsely certified that the information provided in its original application and supporting documents was "true and correct in all material respects."

57. Defendant is reasonably expected to know that it is part of an international conglomerate and that it is an affiliate of Sunstar Engineering Americas and Sunstar Group. Defendant's false certifications were material to the SBA's and Bank of America's decisions to approve the loan. Had Defendant been transparent with Bank of America and the SBA, its loan application and subsequent request for loan forgiveness would not have been approved.

58. By falsely certifying its eligibility, Sunstar Americas, Inc. knowingly misrepresented material facts to the Small Business Administration (SBA), resulting in the approval of a $6,230,492.00 loan and subsequent forgiveness of $6,302,185.00, causing a total loss to the SBA of approximately $6,364,490, including the lender processing fee of $62,304.92 paid to Bank of America.

## COUNT I

### False Claims Act, 31 U.S.C. § 3729(a)(1)(A)

59. Relator re-alleges and incorporates by reference all paragraphs of this complaint set out above as if fully set forth herein.

60. Through the acts set forth above, Defendant knowingly presented, or caused to be presented, false or fraudulent claims for payment to the SBA through Bank of America for a first draw PPP loan and loan forgiveness to which it was not entitled.

61. The United States was deceived as a result of Defendant's conduct. Such fraudulent conduct was material to the United States' decision to pay such claims. Had the Government known of Defendant's false claims, the United States would not have paid or approved those claims.

62. By virtue of the false or fraudulent claims that Defendant knowingly made or presented, or caused to be made or presented, Defendant violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), and the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## COUNT II

### False Claims Act, 31 U.S.C. § 3729(a)(1)(B)

63. Relator re-alleges and incorporates by reference all paragraphs of this complaint set out above as if fully set forth herein.

64. Through the acts set forth above, Defendant knowingly made, used, or caused to be made and used, false records and statements material to the payment of false or fraudulent claims by SBA through Bank of America for its PPP loan and loan forgiveness to which it was not entitled.

65. The United States was deceived as a result of Defendant's conduct. Such fraudulent conduct was material to the United States' decision to pay such claims. Had the Government known of Defendant's use of false records or statements material to false or fraudulent claims for payment or approval, the United States would not have paid or approved those claims.

66. By virtue of the false records and statements Defendant made, used, or caused to be made or used, Defendant violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(B), and the

United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

**Prayer for Relief**

a. A judgment against Defendant in an amount equal to all damages due to the Government, including treble damages, under the FCA;

b. A judgment against Defendant for all civil penalties due to the Government for Defendant' violations of the FCA;

c. That Relator recover from Defendant all costs of this action, with interest, including the cost to the Government for its expenses related to this action;

d. That Relator recover from Defendant all reasonable attorneys' fees in bringing this action;

e. That Relator be awarded the maximum amount of the proceeds of this action as allowed under 31 U.S.C. § 3730, and/or any other applicable provision of law;

f. That a trial by jury be held on all issues so triable;

g. An award of pre- and post-judgment interest; and

h. Such other and further relief to Relator and/or the United States of America as this Court may deem just and proper.

**REQUEST FOR TRIAL BY JURY**

Relator hereby requests a trial by jury.

Dated: August 11, 2025

Charles H. Rabon, Jr.
N.C. State Bar No. 16800
crabon@usfraudattorneys.com

Rabon Law Firm, PLLC
413 S. Sharon Amity Road
Suite C
Charlotte, NC 28211
Tel. 704-247-3247
Fax 704-208-4645

*Attorneys for Plaintiff-Relator*

Stephen A. Teller, WSBA #23372
Teller Law
300 Lenora St. #1471
Seattle, WA 98121
(206) 324-8969

*To be admitted Pro Hac Vice*